1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9                   EASTERN DISTRICT OF CALIFORNIA

10

11   CHARLES TIMMONS,
                                      2:05-cv-02175-MCE-EFB
12            Plaintiff,

13       v.                           MEMORANDUM AND ORDER

14   UNITED PARCEL SERVICE, INC.;
     DOES 1 through 20, inclusive,
15
              Defendants.
16
                          ----oo0oo----
17

18       Through the present action, Plaintiff Charles Timmons, a

19   former employee of Defendant United Parcel Service, Inc. ("UPS"),

20   seeks damages and equitable relief for alleged discrimination

21   based on disability and age, retaliation and wrongful

22   termination.  Plaintiff brings the action pursuant to the

23   Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq*.

24   ("ADA"), the California Fair Employment and Housing Act, Cal.

25   Gov't Code § 12940 *et seq*. ("FEHA") and the Age Discrimination in

26   Employment Act, 29 U.S.C. § 621 *et seq.* ("ADEA").

27   ///

28   ///

                                 1

Presently before the Court is Defendant's Motion for Summary Judgment, wherein Defendant argues, inter alia, that Plaintiff is not a qualified individual under either the ADA or FEHA, that Plaintiff's actions do not constitute "protected activity" and cannot support a retaliation claim, and that Plaintiff did not suffer a cognizable adverse employment act.  For the reasons set forth below, Defendant's Motion for Summary Judgment is GRANTED.[1]

**BACKGROUND**[2]

Plaintiff worked as a package loader and package car driver for UPS from approximately 1981 until his retirement on January 1, 2006.  Plaintiff was a member of the Teamsters Union, which maintains a collective bargaining agreement ("CBA") with UPS governing several aspects of Plaintiff's employment.  The CBA includes a seniority-based bidding system for assigning delivery routes to package car drivers.  Through this system, Plaintiff was awarded a route servicing Magalia, California ("Magalia route").

///

///

///

---

[1] Because oral argument will not be of material assistance, the Court orders this matter submitted on the briefs.  E.D. Cal. Local Rule 78-230(h).

[2] Unless otherwise noted, the Court finds the following facts undisputed. In his response to Defendant's Separate Statement of Undisputed Facts, Plaintiff disputes or qualifies many of Defendant's statements of fact.  In the vast majority of instances, Plaintiff cites inadmissible or immaterial evidence, and as such, the Court treats the subject fact as undisputed.

1    Prior to June of 2004, Plaintiff drove a P-320 package car
2  ("P-320") on the Magalia route.  The P-320 has 320 cubic feet of
3  cargo capacity as well as power steering, a car-like seat with a
4  shoulder belt and an automatic transmission.  According to Paul
5  Rickson ("Rickson"), a UPS supervisor in the Sacramento Valley
6  District charged with assigning package cars to routes, the P-320
7  was too small to regularly accommodate the demands of the Magalia
8  route during periods in 2004.  Rickson had to arrange for a
9  driver to shuttle packages out to Plaintiff at a midpoint in his
10 route, or shift some deliveries to another driver.  Shuttling
11 these packages required UPS to put an extra car and driver on the
12 road.  Shifting packages to another driver resulted in overtime
13 for the other driver, and less than a full day's work (as
14 required by the CBA) for the Magalia route driver.

15   On June 29, 2004, Plaintiff went on short term disability
16 leave as a result of a foot injury.  During this leave of
17 absence, Rickson replaced the P-320 on the Magalia route with a
18 larger P-500 package car ("P-500").  With 500 cubic feet of
19 capacity, the P-500 could accommodate the volume of packages on
20 the Magalia route while successfully navigating the narrow rural
21 roads.  The P-500 was the largest truck that could handle the
22 Magalia route.  The P-500 has neither power steering nor
23 automatic transmission.

24   After recovering from foot surgery, Plaintiff returned to
25 work on October 12, 2004.  Plaintiff immediately noticed the P-
26 500 assigned to his route and made a complaint to his
27 supervisors, noting the lack of power steering and automatic
28 transmission.

Plaintiff worked the Magalia route in the P-500 for three days, then informed Rickson that cumulative work-related injuries prevented him from performing his regular duties.  A doctor examined Plaintiff on October 15, 2004, restricting him to driving a vehicle with power steering and an automatic transmission.

Rickson determined that there was no available package car which would accommodate Plaintiff's restrictions and also negotiate the Magalia route.  Additionally, Plaintiff was not able to successfully bid on an available route with a vehicle meeting his alleged requirements.[3]  As a result, Plaintiff was assigned temporary light duty in accordance with the UPS workers' compensation program.  Plaintiff performed administrative work for one month, during which time no suitable routes or vehicles became available.  After Plaintiff exhausted his light duty eligibility, he took a leave of absence.  Liberty Mutual, UPS's worker's compensation administrator, denied Plaintiff's disability claim.[4]

In November of 2004, Plaintiff applied for and received disability benefits from the California Employment Development Department ("EDD").  Dr. Krone, Plaintiff's physician, certified in his EDD claim that he suffered from knee and shoulder injuries effective November 18, 2004, with an anticipated return to work date of May 1, 2005.

---

[3] In accordance with the CBA, UPS could not assign a driver to a particular route.  Package car drivers bid on routes that are awarded to the most senior driver bidding.

[4] Liberty Mutual determined Plaintiff's injuries were not caused by work-related activity.

Dr. Krone limited Plaintiff to lifting no more than ten pounds.
Dr. Krone repeated this limitation in two follow-up EDD requests
for information, each time pushing back Plaintiff's estimated
return to work date.  On September 8, 2005, Dr. Krone certified
to EDD that Plaintiff could not "work with shoulders at chest
level or above," estimating that Plaintiff could return to work
in approximately five (5) months.

During his leave of absence, Plaintiff submitted a written
request to UPS for job-related accommodation.  In response, UPS
sent a request for medical information to Plaintiff, which Dr.
Krone completed on April 8, 2005.  Dr. Krone listed rotator cuff
disorder and knee/sacroiliac joint arthropathy as impairments
that prevented Plaintiff from fulfilling the physical and mental
functions of his employment, including a temporary restriction on
lifting more than twenty pounds.  Dr. Krone listed the rotator
cuff disorder as a permanent impairment, stating that Plaintiff
is "unable to work over head due to shoulder dysfunction."[5]

On July 26, 2005, UPS's Sacramento Valley District Workforce
Planning Manager Rick Dugan ("Dugan") contacted Plaintiff.
Plaintiff and Dugan discussed Plaintiff's medical restrictions
and his desire to drive a vehicle equipped with power steering
and automatic transmission.  On August 12, 2005, Dugan called
Plaintiff to offer him the opportunity to bid on a route with a
suitable vehicle, the first to come available since Plaintiff
went on leave.

_____

[5] Dr. Krone attested to the same diagnosis in several
subsequent supplemental disability medical information requests.
Dr. Krone permanently limited Plaintiff to less than one hour of
standing, six hours of sitting and two blocks of walking per day.

Plaintiff informed Dugan that he was not interested in the
proposed route.[6]  In addition, Plaintiff notified Dugan that he
planned to undergo shoulder surgery in the near future.  Dugan
asked Plaintiff to call him after he recovered from his
surgeries.  Dugan had no further contact with Plaintiff.

While on disability leave from UPS, Plaintiff pursued a
career in real estate.[7]  Plaintiff received his real estate
license in October of 2005 and began training with a local
realtor in November of 2005.  During this period, Plaintiff also
underwent several surgeries on his knees and shoulders.  On
January 1, 2006, the first day Plaintiff qualified for
retirement, Plaintiff retired from his position at UPS.

**STANDARD**

The Federal Rules of Civil Procedure provide for summary
judgment when "the pleadings, depositions, answers to
interrogatories, and admissions on file, together with
affidavits, if any, show that there is no genuine issue as to any
material fact and that the moving party is entitled to a judgment
as a matter of law."  Fed. R. Civ. P. 56(c).

///

---

[6] In his deposition, Plaintiff told Dugan "I wasn't
interested in that route.  I didn't get 25 years on the job...to
go back to a route that was even more difficult for me than the
one I had finally earned."

[7] Plaintiff admits in an interrogatory that he had been
preparing for a career in real estate since November 18, 2004.
On November 25, 2004, Plaintiff notified his union that he was
going to retire on January 1, 2006.

1  One of the principal purposes of Rule 56 is to dispose of

2  factually unsupported claims or defenses.  *Celotex Corp. v.*

3  *Catrett*, 477 U.S. 317, 325 (1986).

4       Rule 56 also allows a court to grant summary adjudication on

5  part of a claim or defense.  *See* Fed. R. Civ. P. 56(a) ("A party

6  seeking to recover upon a claim ... may ... move ... for a

7  summary judgment in the party's favor upon all or any part

8  thereof."); *see also Allstate Ins. Co. v. Madan*, 889 F. Supp.

9  374, 378-79 (C.D. Cal. 1995); *France Stone Co., Inc. v. Charter*

10 *Township of Monroe*, 790 F. Supp. 707, 710 (E.D. Mich. 1992).

11      The standard that applies to a motion for summary

12 adjudication is the same as that which applies to a motion for

13 summary judgment.  <u>See</u> Fed. R. Civ. P. 56(a), 56(c); *Mora v.*

14 *ChemTronics*, 16 F. Supp. 2d. 1192, 1200 (S.D. Cal. 1998).

15           Under summary judgment practice, the moving party
             always bears the initial responsibility of informing
16           the district court of the basis for its motion, and
             identifying those portions of 'the pleadings,
17           depositions, answers to interrogatories, and admissions
             on file together with the affidavits, if any,' which it
18           believes demonstrate the absence of a genuine issue of
             material fact.
19

20 *Celotex Corp. v. Catrett*, 477 U.S. at 323(quoting Rule 56(c)).

21      If the moving party meets its initial responsibility, the

22 burden then shifts to the opposing party to establish that a

23 genuine issue as to any material fact actually does exist.

24 *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574,

25 585-87 (1986); *First Nat'l Bank v. Cities Serv. Co.*, 391 U.S.

26 253, 288-89 (1968).

27 ///

28 ///

1    In attempting to establish the existence of this factual

2    dispute, the opposing party must tender evidence of specific

3    facts in the form of affidavits, and/or admissible discovery

4    material, in support of its contention that the dispute exists.

5    Fed. R. Civ. P. 56(e).  The opposing party must demonstrate that

6    the fact in contention is material, i.e., a fact that might

7    affect the outcome of the suit under the governing law, and that

8    the dispute is genuine, i.e., the evidence is such that a

9    reasonable jury could return a verdict for the nonmoving party.

10   *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 251-52

11   (1986); *Owens v. Local No. 169, Assoc. of Western Pulp and Paper*

12   *Workers*, 971 F.2d 347, 355 (9th Cir. 1987).  Stated another way,

13   "before the evidence is left to the jury, there is a preliminary

14   question for the judge, not whether there is literally no

15   evidence, but whether there is any upon which a jury could

16   properly proceed to find a verdict for the party producing it,

17   upon whom the onus of proof is imposed."  *Anderson*, 477 U.S. at

18   251 (quoting *Improvement Co. v. Munson*, 14 Wall. 442, 448, 20

19   L.Ed. 867 (1872)).  As the Supreme Court explained, "[w]hen the

20   moving party has carried its burden under Rule 56(c), its

21   opponent must do more that simply show that there is some

22   metaphysical doubt as to the material facts .... Where the record

23   taken as a whole could not lead a rational trier of fact to find

24   for the nonmoving party, there is no 'genuine issue for trial.'"

25   *Matsushita*, 475 U.S. at 586-87.

26   ///

27   ///

28   ///

1    In resolving a summary judgment motion, the evidence of the

2 opposing party is to be believed, and all reasonable inferences

3 that may be drawn from the facts placed before the court must be

4 drawn in favor of the opposing party.  *Anderson*, 477 U.S. at 255.

5 Nevertheless, inferences are not drawn out of the air, and it is

6 the opposing party's obligation to produce a factual predicate

7 from which the inference may be drawn.  *Richards v. Nielsen*

8 *Freight Lines*, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985),

9 *aff'd*, 810 F.2d 898 (9th Cir. 1987).

10

11                          **ANALYSIS**

12

13 **1.   Disability Discrimination**

14

15    To establish a prima facie case for disability

16 discrimination under either ADA or FEHA, Plaintiff must show that

17 he is disabled, that he is a qualified individual capable of

18 performing the essential functions of his job with or without

19 reasonable accommodation, and that he was subjected to an adverse

20 employment action because of his disability.  *See, e.g., Kaplan*

21 *v. City of N. Las Vegas,* 323 F.3d 1226, 1229 (9th Cir. 2003),

22 *Jensen v. Wells Fargo Bank,* 85 Cal. App. 4th 245, 254 (2000).

23 The uncontested medical evidence clearly shows Plaintiff's

24 injuries reach the threshold to qualify as a disabled individual

25 under both ADA and FEHA.  This same evidence also demonstrates

26 that Plaintiff is not a qualified individual capable of

27 performing his essential duties.

28 *///*

9

1   According to the ADA, a "qualified individual with a

2   disability" means an individual with a disability who, with or

3   without reasonable accommodation, can perform the essential

4   functions of the employment position.  42 U.S.C. § 12111(8).

5   Consideration is given to the employer's judgment as to what job

6   functions are essential, and any written description of job

7   responsibilities will be considered evidence of essential

8   functions of the job.  *Id.*

9   In the instant case, ample evidence shows that rigorous

10  physical activity is an essential function of a UPS package car

11  driver.  In his deposition, Plaintiff attests to lifting packages

12  weighing up to seventy (70) pounds to heights above shoulder

13  level and lowering packages to foot level as part of his

14  employment.  This is further illustrated in a written job

15  description for package car drivers that specifies essential

16  functions.  These include bending, stooping, crouching, lifting,

17  lowering, pushing, pulling, leveraging and manipulating equipment

18  and packages averaging twelve (12) pounds and up to seventy (70)

19  pounds, as well as operating manual transmission vehicles.  Dugan

20  Dec., Exh. A.  Between Plaintiff's own admissions and the

21  consideration given to employers by statute, this Court finds

22  lifting heavy packages above shoulder level to be an essential

23  function of a package car driver.

24  In obtaining his disability benefits, Plaintiff stated that

25  he could not perform his regular work responsibilities from

26  November 18, 2004 onward.  Dr. Krone initially limited Plaintiff

27  to lifting no more than ten pounds over his head.

28  ///

10

1  Several months later (and before the lifting restriction
2  expired), Dr. Krone permanently restricted Plaintiff from working
3  above the shoulder level.  Relying on these and other physical
4  limitations, Plaintiff received monthly disability payments for
5  approximately one year.  Defendant contends, and this Court
6  agrees, that Plaintiff cannot claim qualified individual status
7  in a ADA or FEHA claim where he has already obtained benefits due
8  to disability.[8]

9       Defendant also argues that Plaintiff cannot claim to be a
10 qualified individual by judicial estoppel.  Judicial estoppel
11 precludes a party from gaining an advantage by taking one
12 position, and then seeking a second advantage by taking an
13 incompatible position.  *Rissetto v. Plumbers and Steamfitters*
14 *Local 343*, 94 F.3d 597, 605-06 (9th Cir. 1996).  By accepting
15 disability benefits, Plaintiff has benefitted from Dr. Krone's
16 determination that he cannot fulfill the essential functions of
17 his employment.  Allowing Plaintiff to pursue an ADA or FEHA
18 claim as a qualified individual would allow Plaintiff to hold
19 (and benefit from) inconsistent positions.  Here, as in *Rissetto*,
20 the Court determines that Plaintiff cannot claim to be able to
21 perform his essential duties once he has benefitted from claiming
22 disability.

23 ///

24 _____

25      [8] Plaintiff disputes that lifting heavy packages was an
   essential function of his work.  However, employers are given
26 consideration in determining essential job functions, especially
   where, as here, written evidence exists as to the position's
27 physical requirements.  Additionally, Plaintiff's own deposition
   contradicts this dispute.  Plaintiff has not met the burden of
28 showing that an issue of triable fact exists regarding his
   essential functions as a package car driver.

1    Having failed to establish a prima facie case of disability

2    discrimination under ADA or FEHA, Plaintiff cannot pursue this

3    cause of action against Defendant UPS.[9]

4

5    **2.   Retaliation**

6

7    To establish a prima facie case of retaliation, Plaintiff

8    must show that he engaged in a protected activity, he suffered an

9    adverse employment decision, and there was a causal link between

10   his protected activity and the adverse employment decision.  *See*

11   *Brooks v. City of San Mateo*, 229 F.3d 917, 928 (9th Cir. 2000),

12   *Barnett v. U.S. Air, Inc.*, 228 F.3d 1105, 1121 (9th Cir. 2000)

13   (vacated on other grounds).  Next, UPS is obligated to provide a

14   legitimate, nondiscriminatory reason for its actions. *See, e.g.,*

15   *Strother v. S. Cal. Permanente Med. Group*, 79 F.3d 859, 868 (9th

16   Cir. 1996).  Plaintiff then must respond with "specific,

17   substantial evidence of pretext."  *McAlindin v. County of San*

18   *Diego*, 192 F.3d 1226, 1238 (9th Cir. 1999) (internal citations

19   omitted).

20   Plaintiff alleges, and this Court accepts for purposes of

21   summary judgment, that he engaged in protected activity by making

22   several complaints to his supervisors regarding the failure of

23   UPS to accommodate his disability by providing him with a

24   suitable vehicle.

25   _____

26   [9] Because Plaintiff cannot establish an issue of triable
     fact as to his status as a qualified individual, the Court does
27   not reach the remaining defenses raised by UPS, including the
     existence of an adverse employment decision or failure to engage
28   in the interactive process.

1  Plaintiff also argues that UPS subjected him to an adverse
2  employment decision by not accommodating him after he made the
3  complaints, establishing both the second and third elements of
4  his claim.

5       The Ninth Circuit has not provided clear guidance on the
6  issue of what qualifies as an adverse employment decision.  In
7  *Yartzoff v. Thomas,* 809 F.2d 1371, 1375 (9th. Cir. 1987), the
8  Ninth Circuit suggests that an adverse action does not have to
9  rise to the level of an ultimate employment decision, such as a
10 demotion or termination.  Later decisions contradict *Yartzoff*, as
11 the Ninth Circuit has sometimes required a loss of salary or
12 benefits, a change in responsibilities or a demotion in order to
13 qualify as an adverse employment decision.  *See Steiner v.*
14 *Showboat Operating Co.*, 25 F.3d 1459, 1465 (9th Cir. 1994).
15 Consequently, it is by no means clear that Plaintiff suffered an
16 adverse employment decision giving rise to a retaliation claim in
17 this case.  In any event, this Court does not have to
18 definitively answer whether UPS's alleged failure to accommodate
19 Plaintiff is an adverse employment decision, as Plaintiff was not
20 a qualified individual and could not be accommodated.
21 Defendant's inability to accommodate Plaintiff's physical
22 disabilities constitutes a legitimate, non-discriminatory
23 explanation for Defendant's actions.

24      Plaintiff alleges that UPS did not provide him with a
25 suitable vehicle in response to his complaints of failure to
26 accommodate his disability.
27 ///
28 ///

1  However, even if UPS had breached the CBA by assigning Plaintiff

2  to a suitable route or purchased a new vehicle for Plaintiff to

3  drive, he would not have been able to perform his essential job

4  functions due to his shoulder injuries.  Because no truck in the

5  UPS fleet could accommodate Plaintiff's disability, UPS's

6  decision to place the P-500 on the Magalia route cannot be an

7  adverse employment decision.

8      Additionally, Plaintiff fails to establish a triable issue

9  of fact on causation.  In a retaliation claim, the retaliatory

10  acts must follow protected activity as a matter of logic.  Here,

11  Plaintiff alleges that UPS retaliated against him by switching

12  vehicles on his route, failing to accommodate his requests.[10]

13  However, Plaintiff engaged in protected activity after the trucks

14  were switched.  Plaintiff cannot allege that conduct that

15  occurred prior to alerting his supervisors of his accommodation

16  requests is retaliation for making the complaint.

17      In the event Plaintiff were to successfully assert a prima

18  facie case of retaliation, Plaintiff fails to demonstrate that

19  UPS's reasons for placing a P-500 on the Magalia route are mere

20  pretext.  The facts of this case show a legitimate business

21  reason for replacing the smaller P-320.  For some time leading up

22  to Plaintiff's June, 2004 foot surgery, the P-320 was not large

23  enough to hold all the packages for the Magalia route.  Replacing

24  the P-320 with the P-500 seemingly solved this problem.

25  ///

26

27  [10] In his Complaint, Plaintiff also alleged retaliation for
safety concerns that he raised prior to 2004.  This type of

28  activity is not protected activity under FEHA or ADA, as those
statutes do not protect such whistleblowing activity.

Indeed, at no time after switching trucks was a vehicle smaller than the P-500 used on the Magalia route.  Plaintiff's self-serving declarations do not meet the burden of providing substantial evidence of pretext.  Accordingly, this Court finds no triable issue of fact as to retaliation.

**3.   Age Discrimination**

Plaintiff presents no competent evidence to suggest even the slightest hint of age discrimination on the part of UPS. Moreover, the conditions under which Plaintiff worked strongly favor employees with more experience on the job.  As mentioned above, the CBA which governs package car drivers favors drivers with more seniority, giving them first pick on available routes. This Court finds that Plaintiff has not met his burden of demonstrating a triable issue of fact as to age discrimination.

**4.   Wrongful Termination**

Plaintiff's wrongful termination claims are derivative of his prior claims.  As mentioned above, Plaintiff has not met his burden demonstrating a triable issue of fact as to his discrimination and retaliation claims.  Because this Court finds UPS did not violate public policy, it cannot be liable for wrongful termination based on such a violation.[11]

---

[11] In his Memorandum, Plaintiff raises wrongful termination in violation of public policy based on California Labor Code §
(continued...)

1    Plaintiff also cannot prove the that he was terminated, even
2  constructively, by UPS.  In fact, Plaintiff remained on the UPS
3  roster, accruing enough years of experience to reach retirement
4  thirteen months after he went on leave.  Plaintiff's self-serving
5  declarations of harassment do not meet the burden of
6  demonstrating conditions severe enough to warrant a finding of
7  constructive discharge.

8

9                               **CONCLUSION**

10

11    For the above-stated reasons, Defendant's Motion for Summary
12  Judgment is GRANTED.
13    IT IS SO ORDERED.

14
 Dated: August 7, 2007
15
16
17                              MORRISON C. ENGLAND, JR.
                                UNITED STATES DISTRICT JUDGE
18
19
20
21
22
23
24
25
26    [11](...continued)
    6310 *et seq.*  This Court will not consider this argument, as it
27  is not included in Plaintiff's initial cause of action.  *Stallcop
    v. Kaiser Found. Hosps.,* 820 F.2d 1044, 1050 n.5 (9th Cir. 1987).
28

                                    16