UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

CHARLES TIMMONS,                    No. 2:05-cv-02175-MCE-EFB

            Plaintiff,

        v.                          <u>FINAL PRETRIAL ORDER</u>

UNITED PARCEL SERVICE, INC.,        TRIAL DATE: **August 2, 2010**
                                    TIME: **9:00 a.m.**
            Defendant.
_____/

        Pursuant to Court Order, a Final Pretrial Conference was
held on June 11, 2010.  Jill Telfer appeared as counsel for
Plaintiff.  Jeff Grube and Jeff Michalowski appeared as counsel
for Defendant.  After hearing, the Court makes the following
findings and orders:

        I.  <u>JURISDICTION/VENUE</u>

        Jurisdiction is predicated upon 28 U.S.C. section 1332 and
42 U.S.C. section 12100 et seq.  Jurisdiction and venue are not
contested.

        II.  <u>JURY</u>

        Plaintiff timely demanded a jury trial pursuant to
Rule 38(b) of the Federal Rules of Civil Procedure.

1

III.   UNDISPUTED FACTUAL ISSUES

1.   UPS operates a package delivery business.

2.   UPS hired Plaintiff Charles Timmons in the early 1980's.  UPS hired Timmons as a part time preloader and he worked in that position until April 1, 1986.

3.   Timmons began working for UPS as a fulltime package car driver on April 1, 1986.

4.   At all times during his employment with UPS, Timmons worked out of UPS's Chico facility.

5.   The Chico facility is one of approximately twenty-five facilities in what was then UPS's Sacramento Valley District.

6.   What was then the Sacramento Valley District was within UPS's former Pacific Region, which reported to UPS's Corporate Headquarters.  At all times relevant, there were nine UPS regions within the United States.

7.   In 2004, Timmons reported to the Preload Supervisor of the Chico facility, Paul Rickson, as his immediate supervisor. Rickson reported to Chico Business Manager Joe Kuhn.  Kuhn managed approximately 135 employees at the Chico facility. During part of that time Kuhn reported to Danny Moss.

8.   There are approximately fifty package cars at the Chico facility at one time with approximately eight types of package cars.

9.   UPS maintains several different sizes of package cars, from P-200 to P-1200; the package car names reflect the volume capacity of each vehicle.  For example, P-500 package cars have 500 cubic feet of space.

///

2

10.   Timmons developed injuries based on cumulative trauma over the years he worked for UPS.

11.   Timmons suffered physical injuries which limited his ability to, among other things, lift, sit for extended periods of time and drive package cars with manual transmission which did not have power steering.

12.   UPS granted Timmons a leave of absence from June 29, 2004, to October 12, 2004 for Timmons' foot and hernia surgeries.

13.   In 2002, Timmons voluntarily bid on, and received the Magalia route.  The Magalia route was a rural route near Chico, California.  He continued to drive the Magalia Route until his leave of absence in June 2004.

14.   The P-320 package car driven on the Magalia Route from 2002 through 2004 had automatic transmission, power steering and a seat with lumbar support.

15.   The P-500 package car did not have automatic transmission, power steering or a seat with lumbar support.

16.   The P-500 could contain a higher volume of packages than the P-320.

17.   When Timmons returned from leave on October 12, 2004, he asked UPS to remove the P-500 package car from his route and allow him to use the P-320 package car, which had power steering, automatic transmission and a seat with lumbar support.

18.   UPS was presented with a doctor's note on October 15, 2004 that restricted Timmons to driving a package car with power steering and automatic transmission.

19.   Timmons began a leave of absence on November 19, 2004.
///

3

1    20.   On March 18, 2005, Timmons sent UPS a letter again

2  requesting to drive a package car with power steering and

3  automatic transmission on his route.

4    21.   On March 25, 2005, UPS sent a letter to Timmons asking

5  him to submit medical information regarding his disability.

6    22.   On April 8, 2005, Dr. Krone responded to UPS's request

7  for medical information.

8    23.   Timmons obtained his real estate license in October

9  2005.

10    24.   In November 2005, Timmons began working as a real

11  estate agent for Century 21.

12    25.   At the time of Timmons's retirement, on January 1,

13  2006, his UPS hourly rate was $26.45.

14    26.   Package car drivers-the familiar brown-suited UPS

15  employees work alone during most of their days delivering

16  packages in brown UPS delivery trucks, known as "package cars."

17    27.   Management in each UPS facility assigns package cars to

18  routes based primarily on the volume of packages delivered and

19  picked up, mileage, and terrain.  Routes with heavier volume

20  demand larger capacity package cars.

21    28.   At all times during his employment with UPS, Plaintiff

22  was a member of the International Brotherhood of Teamsters

23  ("Teamsters").

24  ///

25  ///

26  ///

27  ///

28  ///

4

29.  At all times during his employment with UPS, Plaintiff's employment was subject to the collective bargaining agreement ("CBA") between UPS and the Teamsters.  The operative "CBA" at all relevant times consisted of the National Master United Parcel Service Agreement and the Northern California Supplemental Agreement and Northern California Sort Rider, for August 1, 2002 through July 31, 2008.

30.  UPS does not assign drivers to package car delivery routes.  Routes are bid upon by drivers and awarded based on seniority, according to the CBA.

31.  UPS would be in violation of the CBA if it assigns a particular driver to a route without posting the route for possible bid by more-senior drivers.

32.  UPS hired Plaintiff on March 1, 1982.

33.  Plaintiff's union seniority date for bidding purposes is April 1, 1986 (the date he became a full-time package driver).

34.  Plaintiff suffered significant injuries in a 1979 motorcycle accident and, over time, he developed a degenerative rotator cuff condition and other debilitating injuries including: (1) disorders of bursae and tendons in the shoulder region; (2) sciatica, which is swelling in the sacroiliac joints with pain radiating down; (3) arthritis in several areas including shoulders, hips, knees and ankles; (4) generalized osteoarthritis in multiple joints; (5) tendonitis in the elbows and shoulders; and (6) chronic left piriformis (hip) muscle strain.  These conditions made lifting packages, driving a vehicle, and performing his other package car driver job duties painful for him.

35.   On April 9, 2004, Plaintiff told his primary care physician, Dr. Krone, that he could retire in January 2006.

36.   The Magalia route covers largely rural terrain, with narrow roads that have sharp turns and trees with low hanging branches.

37.   Preceding 2004, the volume of packages on the Magalia route had increased.

38.   In 2004, the volume of packages on the Magalia route continued to increase.

39.   In July 2004, during Plaintiff's time off work for surgery, UPS replaced the P-320 package car that was assigned to his route with a larger package car the P-500.

40.   UPS replaced the P-320 package car on the Magalia route because, at that time, the P-320 regularly could not contain all of the packages delivered on the route.

41.   On days when the P-320 package car could not contain the volume of packages on the Magalia route, UPS had to arrange for an employee to shuttle packages out to the route (after some packages had been delivered) or require the driver on the adjacent route to deliver packages from the Magalia route.

42.   Like the P-320, the P-500 could navigate the rough terrain and narrow roads of the rural Magalia route.

43.   After UPS assigned a P-500 package car to the Magalia route, it rarely had to shuttle packages to the Magalia route driver or shift packages onto the adjacent route.

44.   When Plaintiff returned from leave on October 12, 2004, he returned with a full release to work with no restrictions.
///

6

45.   October 15, 2004 is the first time Plaintiff presented UPS with work restrictions during the entire time he drove the Magalia route.

46.   UPS determined, in October 2004, that none of its package cars with power steering and automatic transmission were appropriate for the package volume on the Magalia route.

47.   The CBA, which governed the terms of Plaintiff's employment, provided that Plaintiff could bid on and obtain an available position only based on his seniority.

48.   UPS determined, in October 2004, that it had no available routes for which Plaintiff had the seniority to bid successfully that utilized package cars with power steering and automatic transmission.

49.   UPS determined, in October 2004, that it could not place the P-320 package car back on the Magalia route, because the P-320 was too small to handle the package volume on the route.

50.   From October 18, 2004 through November 18, 2004, UPS accommodated Plaintiff's driving restriction by providing him with temporary light-duty work at full pay and benefits.

51.   According to its workers' compensation program governed by the CBA, UPS provides light duty work for up to twenty-nine days.

52.   The essential functions of Plaintiff's package car driver position included lifting packages to heights above the shoulder, lowering packages to foot level, lifting packages weighing on average 12 pounds and up to 70 pounds, and assisting in moving packages up to 150 pounds.

53.   The essential functions of Plaintiff's package car driver position included bending, stooping, squatting, crouching, climbing, standing, walking, turning and pivoting for up to 9.5 hours per day, 5 days per week.

54.   In Dr. Krone's opinion, from November 18, 2004 to August 11, 2005 (during Plaintiff's leave of absence), Plaintiff should not have been climbing in and out of a package car for more than six hours per day, due to his knee condition.

55.   Dr. Krone advised Plaintiff, between October 2004 and November 2005, that he should not continue working as a UPS package car driver due to his health condition.

56.   On December 6, 2004, Plaintiff's primary care physician, Dr. Krone, completed an Employment Development Department ("EDD") Claim for Disability Benefits form on which she stated that Plaintiff had been incapable of performing his regular work as of November 18, 2004, Dr. Krone anticipated Plaintiff could return to his customary work on May 1, 2005, and "Patient is currently told not to lift more than 10 lbs at a time."

57.   During his leave of absence, Plaintiff collected disability payments from UPS's short-term and long-term disability plans, from the State of California and from his private disability insurance companies.

58.   On November 25, 2004, Plaintiff called his union and reported his retirement date of January 1, 2006.

59.   In December 2004, Plaintiff began a course of study toward obtaining a real estate license for a new career in the real estate field.

8

60.   In March 2005, UPS had no available routes for which Plaintiff had the seniority to bid successfully that utilized package cars with power steering and automatic transmission.

61.   On March 28, 2005, Dr. Krone completed an EDD Request For Additional Medical Information Form stating that Plaintiff could not lift more than ten pounds and would not be able to perform his regular work until September 25, 2005.

62.   On April 8, 2005, Dr. Krone sent a form to UPS stating (1) Plaintiff could not lift anything heavier than twenty pounds until July 8, 2005, and (2) could not lift any weight overhead on a permanent basis.

63.   It is Dr. Krone's medical opinion that as of April 8, 2005, Plaintiff permanently could not lift packages weighing up to seventy pounds, with an average weight of twelve pounds.

64.   On April 8, 2005, Dr. Krone completed a Supplemental Disability Statement Form for Plaintiff's insurance company, certifying that Plaintiff was totally disabled and unable to perform his regular occupation between November 18, 2004 and October 1, 2005, and stating that Plaintiff could not lift ten pounds, stand more than one hour, or walk more than two blocks.

65.   On June 16, 2005, Dr. Krone completed a Supplemental Disability Statement Form for Plaintiff's insurance company, certifying that Plaintiff was totally disabled and unable to perform his regular occupation between November 18, 2004, and October 1, 2005, and stating that Plaintiff could not lift weight greater than fifteen pounds, stand more than one hour, or bend at the knees.

///

66.   On July 26, 2005, UPS Workforce Planning Manager Rick Dugan met with Plaintiff via telephone to discuss Plaintiff's medical restrictions.

67.   On August 12, 2005, Dugan informed Plaintiff of a route coming available that had a P-700 package car.

68.   At the time Dugan informed Plaintiff of the route with the P-700 package car, UPS's Chico facility had P-700 package cars with automatic transmission and power steering.

69.   If Plaintiff bid the route Dugan proposed, UPS planned to ensure the route had a P-700 package car with automatic transmission and power steering.

70.   On August 12, 2005, Plaintiff told Dugan, that he had no interest in bidding on the proposed route with the P-700 package car.

71.   On August 12, 2005, Plaintiff rejected the proposed route accommodation because he recently had knee surgery (August 11, 2005) and planned to have shoulder surgeries (August 24, 2005 and September 16, 2005).

72.   Plaintiff rejected the proposed route with a P-700 package car, in part, because he preferred to drive a P-320 on the Magalia Route.

73.   On August 12, 2005, Dugan asked Plaintiff to call him when he recovered from his surgeries so they could resume the interactive process.

74.   Plaintiff never called Dugan to resume the interactive process after his surgeries.

///

///

10

1    75.   Under the CBA, upon transfer to a union position in a

2    different facility, employees are placed at the bottom of the

3    appropriate seniority list.

4    76.   Plaintiff never informed UPS that he was interested in

5    a transfer, and never submitted a letter for his file stating his

6    reasons for seeking transfer and his desired facility.

7    77.   Plaintiff had knee surgery on August 11, 2005, and two

8    shoulder surgeries:   the first on August 24, 2005, and the second

9    on September 16, 2005.

10   78.   On September 8, 2005, Dr. Krone completed an EDD

11   Physician's Supplementary Certificate reporting Plaintiff could

12   not perform his regular occupation until February 8, 2006,

13   because he could not lift ten pounds above waist level, or work

14   with his shoulders at chest level or above.

15   79.   On October 3, 2005, Plaintiff submitted a retirement

16   request form to UPS, requesting to retire in January 2006.

17   80.   On November 3, 2005, Dr. Krone completed a MetLife

18   Attending Physician Statement reporting that she advises

19   Plaintiff to cease his job at UPS as of November 19, 2004 and

20   specifying that Plaintiff could not lift over twenty pounds,

21   climb, twist/bend/stoop, reach above shoulder level, and could

22   not push or pull with either hand.   Dr. Krone reported that

23   Plaintiff's expected improvement with regard to these

24   restrictions was uncertain.

25   ///

26   ///

27   ///

28   ///

81.   On December 15, 2005, Dr. Krone completed a Physician's Supplemental Disability Statement for Plaintiff's insurance company reporting that Plaintiff could not perform his regular occupation until June 15, 2006, if ever, and Plaintiff could not lift packages.

82.   According to Dr. Krone, Plaintiff's requested accommodation for a powering steering, automatic transmission vehicle would not have helped him perform the lifting, walking, standing, or climbing functions of his job.

83.   Plaintiff remained a UPS employee until he retired on January 1, 2006.

84.   On January 1, 2006, Plaintiff qualified for the Teamsters Program for Enhanced Early Retirement Benefits (PEER), which provides unreduced retirement benefits to retirees who meet specific age and service requirements (combined years of age and service must equal eighty or more).

85.   Plaintiff began receiving his full pension immediately upon retirement at age 56.

86.   UPS reserved Plaintiff's Magalia route during his leave and did not allow any package car drivers to bid the Magalia route until after Plaintiff retired on January 1, 2006.

87.   MetLife, UPS's long term disability ("LTD") insurance provider, approved Plaintiff's claim for LTD benefits through December 18, 2006-nearly a year after he retired on January 1, 2006.

///

///

///

12

88.   MetLife approved Plaintiff's claim for $40,944.51.
MetLife offset his payments by the amounts he received from STD
and EDD.   Had he not retired, Plaintiff would have received
approximately $20,784.00 of this award after January 1, 2006.

89.   Since UPS assigned a P-500 package car to the Magalia
route in 2004, through the present, the regular package car on
the Magalia route has always been a P-500.

90.   As part of his pension plan, Plaintiff is eligible to
receive retiree health/dental/vision and prescription drug
benefits at a cost of $75 per month.

91.   In 2006, Plaintiff earned at least $18,761.50 working
for Century 21.

92.   In 2007, Plaintiff earned at least $52,978.96 working
for Century 21.

93.   In 2008, Plaintiff earned at least $46,679.99 working
for Century 21.

94.   Plaintiff sought treatment from a psychologist for
approximately four months (November 2005 through March 2006).

95.   Plaintiff's psychologist no longer needed to see
Plaintiff after March 2006 because he had recovered from his
depression and anxiety.

96.   Plaintiff's psychologist testified that there is no way
to confirm whether Timmons' depression is attributable to UPS, or
some other cause.

97.   According to Dr. Krone, in July 2009, Plaintiff
informed her that his shoulder, back and hip pain made it hard
for him to work as a realtor.
///

1   98.   Dr. Krone opined in July 2009 that Mr. Timmons would
2   qualify for state disability.

3   99.   Dr. Krone provided Mr. Timmons with a handicap placard
4   in July 2009.

5   IV.   <u>DISPUTED FACTUAL ISSUES</u>

6   The remaining claims for trial are:

7   1.   Whether Plaintiff mitigated his damages adequately.

8   2.   The nature and extent of harm, if any, that Plaintiff
9   suffered from UPS's alleged wrongful conduct.

10   3.   Whether reasonably accommodating Timmons would have
11   created undue hardship for UPS.

12   4.   Whether Rickson and Kuhn had the ability to restructure
13   routes and create routes at the Chico facility.

14   5.   Whether Rickson assigns the trucks to drivers at the
15   Chico facility and therefore had the ability, as did the Kuhn, to
16   reassign the P-320 back to Plaintiff's route if he wanted.

17   6.   Whether the only UPS trucks with automatic
18   transmissions and power steering assigned to the Chico facility
19   while Plaintiff was employed with UPS were the P-320, P-1000 and
20   the P-1200.

21   7.   Whether there were P-320, P-1000 and P-1200, or other
22   trucks available to the Chico facility which would reasonably
23   accommodate Plaintiff's disability.

24   8.   Whether the P-320 truck, which had an automatic
25   transmission, power steering, and a seat with lumbar support,
26   accommodated Timmons' disability.

27   9.   Whether Plaintiff was able to perform his job with the
28   reasonable accommodation of the P-320 truck.

14

10.   Whether any of the trucks available to the Chico facility could have been modified to reasonably accommodate Timmons' disability.

11.   Whether assistive equipment such as a Genie Lift could reasonably accommodate Timmons' disability.

12.   Whether Plaintiff began the interactive process on October 12, 2004 when requesting a truck with power steering and automatic transmission.

13.   Whether those responsible for enforcing the policy were aware as of November 16, 2004 that Plaintiff required reasonable accommodation to be able to continue working.

14.   Whether Plaintiff continued trying to have a dialogue from October 12, 2004 until August 2005, but UPS did not reciprocate.

15.   Whether the UPS company doctor on October 15, 2004 and Plaintiff's treating physicians from March 18, 2007 until Plaintiff was forced into retirement, confirmed Plaintiff's need for this accommodation.

16.   Whether the Magalia route and the P-320 accommodated Plaintiff disability for over two years.

17.   Whether the proposed P-500 or P-700 would have accommodated Plaintiff's disability.

18.   Whether Plaintiff proceeded with surgeries and attempted to learn a new vocation because he felt any additional requests for a timely good faith interactive process and reasonable accommodation would be futile.

19.   Whether assigning Plaintiff to the P-320 or comparable package car would have caused UPS undue hardship.

15

20.   Whether modifying a package car and reasonably accommodating Timmons' disability would have caused undue hardship.

21.   Whether restructuring Plaintiff's route would have created an undue hardship for UPS.

22.   Whether assistive equipment and reasonably accommodation Timmons' disability would have caused undue hardship.

23.   Whether trucks can be assigned from center to center so that if the Chico facility did not have an available truck with automatic transmission and power steering, it could get one from another facility or request one be purchased.

24.   Whether UPS had to shuttle packages to Plaintiff on a consistent basis when he drove the P-320.

25.   Workforce Planning Manager Rick Dugan, located in the Sacramento Valley District office, was responsible for oversight of the reasonable accommodation policy for the Sacramento Valley District.

26.   Whether UPS's accommodation policy provides that when UPS learns an employee with a limitation may need accommodation, UPS must enter into the interactive process. An employee does not have to request reasonable accommodation before UPS will be required to engage in the interactive process. The policy may be triggered when UPS learns an individual may need some assistance to do the job because of a physical limitation.

27.   Whether there existed vacant positions for which Timmons was qualified and able to work within California.

///

16

1   28.   Whether or not UPS' identification of essential job
2   functions of a position are indeed the essential job functions of
3   that position.

4   29.   Whether Dugan's, Beards and/or UPS's managements
5   decision not to provide reasonable accommodation as early as
6   November, 2004 was despicable and done with a willful and knowing
7   disregard of Timmons' rights.

8   All issues of fact remaining in dispute are subject to proof
9   at the time of trial.

10   V.   <u>WITNESSES</u>

11   Plaintiff anticipates calling the witnesses listed on
12   Attachment "A".

13   Defendant anticipates calling the witnesses listed on
14   Attachment "B".

15   Each party may call a witness designated by the other.

16   A.   No other witnesses will be permitted to testify unless:

17   (1)   The party offering the witness demonstrates that
18   the witness is for the purpose of rebutting evidence which could
19   not be reasonably anticipated at the Final Pretrial Conference,
20   or

21   (2)   The witness was discovered after the Final
22   Pretrial Conference and the proffering party makes the showing
23   required in "B" below.

24   B.   Upon the post-pretrial discovery of witnesses, the
25   attorney shall promptly inform the Court and opposing parties of
26   the existence of the unlisted witnesses so that the Court may
27   consider at trial whether the witnesses shall be permitted to
28   testify.   The evidence will not be permitted unless:

17

1    (1)   The witnesses could not reasonably have been
2    discovered prior to pretrial;

3    (2)   The Court and opposing counsel were promptly
4    notified upon discovery of the witnesses;

5    (3)   If time permitted, counsel proffered the witnesses
6    for deposition;

7    (4)   If time did not permit, a reasonable summary of
8    the witnesses' testimony was provided by opposing counsel.

9    VI.   <u>EXHIBITS - SCHEDULES AND SUMMARIES</u>

10   At present, Plaintiff contemplates by way of exhibits those
11   listed on Attachment "C".

12   At present, Defendant contemplates by way of exhibits those
13   listed on Attachment "D".

14   **Plaintiff's exhibits shall be listed numerically.**
15   **Defendant's exhibits shall be listed alphabetically.**   The parties
16   shall use the standard exhibit stickers provided by the Court
17   Clerk's Office:  pink for Plaintiff and blue for Defendant.
18   After three letters, note the number of letters in parenthesis
19   (i.e., "AAAA(4)" to reduce confusion during the trial.  All
20   multi-page exhibits shall be stapled or otherwise fastened
21   together and each page within the exhibit shall be numbered.  All
22   photographs shall be marked individually.  The list of exhibits
23   shall not include excerpts of depositions which may be used to
24   impeach witnesses.

25   Each party may use an exhibit designated by the other.  In
26   the event that Plaintiff and Defendant offer the same exhibit
27   during trial, that exhibit shall be referred to by the
28   designation the exhibit is <u>first</u> <u>identified</u>.

18

The Court cautions the parties to pay attention to this detail so that all concerned, including the jury, will not be confused by one exhibit being identified with both a number and a letter.

A.   No other exhibits will be permitted to be introduced unless:

(1)   The party proffering the exhibit demonstrates that the exhibit is for the purpose of rebutting evidence which could not be reasonably anticipated at the Pretrial Scheduling Conference, or

(2)   The exhibit was discovered after the Pretrial Scheduling Conference and the proffering party makes the showing required in paragraph "B", below.

B.   Upon the post-pretrial discovery of exhibits, the attorneys shall promptly inform the Court and opposing counsel of the existence of such exhibits so that the Court may consider at trial their admissibility.  The exhibits will not be received unless the proffering party demonstrates:

(1)   The exhibits could not reasonably have been discovered prior to pretrial;

(2)   The Court and counsel were promptly informed of their existence;

(3)   Counsel forwarded a copy of the exhibit(s) (if physically possible) to opposing counsel.  If the exhibit(s) may not be copied, the proffering counsel must show that he has made the exhibit(s) reasonably available for inspection by opposing counsel.

///
///

C.   As to each exhibit, each party is ordered to exchange a copy identical to the Court's copy, or other reproduction of the exhibit(s) in a three-ring binder(s) by **July 19, 2010**.  The attorney or representative for each party is directed to present the original and two (2) copies of the exhibit(s) and exhibit list to the Court Clerk's Office, no later than **3:00 p.m., July 12, 2010,** or at such earlier time as may be ordered by the Court.  **NO EXCEPTIONS.**

D.   **The Court shall be presented with a copy of the exhibit(s) in a 3-ring binder(s) with a side tab identifying each exhibit by number or letter.  Each binder shall be no larger than three inches in width and have an identification label on the front and side panel.**

VII.  <u>DISCOVERY DOCUMENTS</u>

A.   <u>Filing Depositions</u>.  It is the duty of counsel to ensure that any deposition which is to be used at trial has been lodged with the Clerk of the Court.  In addition, two unmarked copies of the transcripts must be delivered to the Court Clerk's Office.  Counsel are cautioned that a failure to discharge this duty may result in the Court precluding use of the deposition or imposition of such other sanctions as the Court deems appropriate.

B.   <u>Use of Depositions</u>.  The parties are ordered to file with the Court and exchange between themselves by **July 19, 2010** a statement designating portions of depositions intended to be offered or read into evidence (except for portions to be used only for impeachment or rebuttal).

///

20

1   C.   Interrogatories.  The parties are ordered to file with

2 the Court and exchange between themselves by **July 19, 2010** the

3 portions of Answers to Interrogatories which the respective

4 parties intend to offer or read into evidence at the trial

5 (except portions to be used only for impeachment or rebuttal).

6   VIII.   FURTHER DISCOVERY OR MOTIONS

7   Pursuant to the Court's Pretrial Scheduling Order, all

8 discovery and law and motion was to have been conducted so as to

9 be completed as of the date of the Final Pretrial Conference.

10 That Order is confirmed.  The parties are free to engage in

11 informal agreements regarding discovery and law and motion

12 matters.  However, any such agreements will not be enforceable in

13 this Court.

14   IX.   AGREED STATEMENTS - JOINT STATEMENT OF CASE

15   It is mandatory the parties shall file a short, jointly-

16 prepared statement concerning the nature of this case that will

17 be read to the jury at the commencement of trial (**NO EXCEPTIONS**).

18 The joint statement of the case shall include in plain concise

19 language the claims of Plaintiff and claims of other parties, if

20 any, and the corresponding defense to the claims.  The purpose of

21 the joint statement of the case is to inform the jury at the

22 outset, what the case is about.  The statement must be filed with

23 the Court by **July 19, 2010**.

24   X.   PROPOSED JURY INSTRUCTIONS, VOIR DIRE, VERDICT FORM

25   A.   Jury Instructions

26   Counsel are directed to meet and confer and to attempt to

27 agree upon a joint set of jury instructions.  Counsel shall use

28 the Ninth Circuit Model Jury Instructions and any revisions.

21

Alternate instruction or authority may only be used if a Ninth Circuit Model Jury Instruction is unavailable.  The joint set of instructions must be filed by **July 19, 2010** and shall be identified as the "Jury Instructions Without Objection."

All instructions shall be, to the extent possible, concise, understandable, and free from argument.  See Local Rule 163(c). Parties shall also note that any modifications of instructions from statutory authority, case law or from any form of pattern instructions must specifically state the modification by underlining additions and bracketing deletions.

B.   <u>Verdict Form</u>

The parties must file a joint verdict form(s) concurrently with proposed jury instructions by **July 19, 2010**.  If necessary, a special verdict or interrogatories shall be included for all factual disputes submitted to the jury that must be resolved before questions of law can be decided, and for any other issue on which specific responses are desired.  See Local Rule 163(e).

C.   <u>Voir Dire</u>

The parties shall submit proposed voir dire questions to the Court.  The Court reserves the right to conduct all examination of prospective jurors.  Notwithstanding this reservation, the Court will permit each side up to ten (10) minutes to conduct voir dire, if desired.  The voir dire questions shall be filed with the Court by **July 19, 2010**.

///

///

///

///

1      D.    <u>Submission of Documents to the Court</u>

2      At the time of filing their respective proposed jury

3  instructions, verdict form(s), and voir dire questions, counsel

4  shall also electronically mail to the Court in digital format and

5  compatible with Microsoft Word or WordPerfect, the proposed jury

6  instructions and verdict form(s).  **These documents should be sent**

7  **to mceorders@caed.uscourts.gov.**

8      XI.   <u>AUDIO/VISUAL EQUIPMENT</u>

9      The parties are required to **file electronically** a joint

10 request to the Courtroom Deputy Clerk, Stephanie Deutsch, by

11 **July 12, 2010** if they wish to reserve and arrange for orientation

12 with all parties on the Court's mobile audio/visual equipment for

13 presentation of evidence.  There will be one date and time for

14 such orientation.

15     XII.  <u>DATE AND LENGTH OF TRIAL</u>

16     A trial is scheduled for **August 2, 2010.**  The estimated

17 length of trial is **six (6) days.**  The trial will consist of **eight**

18 **(8) jurors.**  Counsel are to email Stephanie Deutsch, Courtroom

19 Deputy Clerk, at mceorders@caed.uscourts.gov, or call at (916)

20 930-4207, by **July 19, 2010** to ascertain the status of the trial

21 date.

22 ///

23 ///

24 ///

25 ///

26 ///

27 ///

28 ///

23

1   XIII.   <u>OBJECTIONS TO PRETRIAL ORDER</u>

2       Each party is granted five (5) court days from the date of

3   this Final Pretrial Order to object to any part of the order or

4   to request augmentation to it.  A Final Pretrial Order will be

5   modified only upon a showing of manifest injustice.  If no

6   objection or modifications are made, this Order will become final

7   without further order of the Court and shall control the

8   subsequent course of the action, pursuant to Rule 16(e) of the

9   Federal Rules of Civil Procedure.

10      IT IS SO ORDERED.

11  Dated: June 23, 2010

12

13  _____

14  MORRISON C. ENGLAND, JR.
    UNITED STATES DISTRICT JUDGE

15

16

17

18

19

20

21

22

23

24

25

26

27

28